UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL ACTION |
| VERSUS | NO: 14-238 |
| RUFUS JOHNSON, ET AL. | SECTION: "B"(4) |

ORDER AND REASONS

Before the Court is Defendant Rufus Johnson's ("Defendant") two motions to dismiss different subsections of Count 1 from the indictment pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B):

> (1) Record Document 143 seeks to have Count 1(a)[1] dismissed; and
>
> (2) Record Document 154 seeks to have Count 1(b)[2] dismissed.

The government has filed an opposition to both motions and argues that both motions should be denied. (Rec. Doc. 161). For the reasons that follow,

**IT IS ORDERED** that the motions are **DENIED.**

---

[1] Conspiracy to "use and cause to be used interstate commercial carriers and the United States Postal Service in furtherance of a scheme and artifice to defraud and to obtain money and property, including cash, premium payments, and insurance powers of attorney, by means of false and fraudulent pretenses, representations, and promises, in violation of 18 U.S.C. § 1341." (Rec. Doc. 8 at 19).

[2] Conspiracy to "use and cause to be used interstate commercial carriers and the United States Postal Service in furtherance of a scheme and artifice to deprive the Citizens of the City of New Orleans, Louisiana, of their right to the honest services of Lear Enclarde, Gilishia Garrison and Patricia Tate in violation of 18 U.S.C. §§ 1341 and 1346." (Rec. Doc. 8 at 19).

1

I.   BACKGROUND

   A. Facts

The indictment alleges a complex conspiracy to obtain money in exchange for effecting and facilitating the release of inmates from Orleans Parish Prison. (Rec. Doc. 8 at 20). Specifically, defendants Rufus Johnson, James Johnson, Perry Becnel, Josephine Spellman, as well as other co-conspirators, are accused of operating a bail bond business in New Orleans which "used various means, permeated by fraud, in order to obtain inmate releases for customers, including executing commercial surety bail bond contracts; illegally requesting for-profit recognizance releases from public officials; and bribing public employees to release inmates and disclose confidential law enforcement information." *Id.* at 9.

   1. Bail Bond Scheme

A Louisiana bail producer license, issued by the Louisiana Department of Insurance, and an appointment from an insurance company to sign powers of attorney are required to solicit and negotiate bail bonds in this state. The indictment alleges that the Defendant did not have either of these requirements and allegedly hired employees who did possess the necessary qualifications, or required employees to acquire the license, in

2

order to operate his bail bond business under their licenses and sign their names to documents. *Id.* at 22.

The indictment alleges that Insurance Companies A and B were Florida insurance companies authorized by the Louisiana Department of Insurance to act as commercial sureties in bail bond contracts and both companies utilized commercial carriers to send and receive the powers of attorney with their local bail bondsman. It also alleges that co-defendant James Johnson, Defendant's son, who was an attorney, a Louisiana licensed bail bondsman from October 2000 to approximately January 2010, and an appointed bail agent for Insurance Company A from August 1, 2003 to approximately February 2010, had several sub-agents appointed who also were alleged to have allowed Defendant to utilize their licenses for the conspiracy. *Id.* at 12, 14-5.

According to the indictment, commercial bail bonds at Criminal District Court were processed through the Magistrate Clerk's Office. (Rec. Doc 8 at 7). A bond clerk in the Magistrate Clerk's office would prepare a typed bail bond form at the request of a bail bondsman, which included the name of the defendant, criminal charge, bail amount and the name of the insurance company acting as surety. *Id.* The bail bondsman was required to present an executed power of attorney from the insurance company authorizing the bondsman named to sign bail bonds for the insurance company.

3

*Id.* Then, the bondsman was required to sign the bail bond form in the presence of the bond clerk, who would also sign a certification on the bond that he/she witnessed the bondsman signing and that it was indeed the named bondsman signing. *Id.* From there, the bondsman would bring the bail bond and the insurance power of attorney to the Bond Window at the prison. *Id.* at 8. The inmate was required to sign the bail bond as the principal obligor of the bond prior to being released. *Id.* Upon the inmate's release, the executed bail bond and insurance power of attorney become part of the defendant's official court record for the criminal case. *Id.* The information was also entered into the Sheriff's computerized system. *Id.* The bondsman was also required to send copies of the executed powers of attorney back to the insurance companies through the U.S. mail or common carrier. *Id.* at 22.

Defendant is alleged to have operated a bail bond business under various names from a building at 538 South Broad Street in New Orleans from "sometime in 2000 and continuing through in or around September 2014" without a proper license. (Rec. Doc. 8 at 11). Defendant is accused of having signed bail bonds under his employees' names, licenses and insurance appointments. *Id.* at 14-16.

4

### 2. Honest Services Scheme

As part of the conspiracy, Defendant is also alleged to have bribed public officials within the Magistrate Clerk's Office "in exchange for obtaining bail bonds that had been pre-signed and pre-certified by a bond clerk before being signed by the bail bondsman" and "delivery of unexecuted bail bonds, court documents, and information." *Id.* at 17-19. The indictment also includes allegations that, as part of the conspiracy, these public officials were bribed to obtain R.O.R. releases, change defendants' bail status to either lower the set bail amount or change to an R.O.R., or forge and fabricate official documents indicating a Judge had ordered a defendant's R.O.R.[3] (Rec. Doc. 8 at 20-33). Additionally, Defendant and his co-defendants are accused of bribing these public officials in exchange for "obtaining confidential, official-use law enforcement information from limited access computer databases" such as inmates' outstanding warrants and criminal history. *Id.* at 21.

### B. Procedural Posture

Defendant was charged by Indictment on October 31, 2015 with ten counts, including Count 1 - conspiracy to commit honest

---

[3] R.O.R. releases for municipal and traffic offenses can be ordered by every elected public official in New Orleans, including members of the Orleans Parish Democratic Executive Committee, which co-defendant James Johnson was a member from February 20, 2008 to February 20, 2012. For all other offenses, R.O.R.s can only be ordered by a judge or commissioner and required a signed Order of Release. (Rec. Doc. 8 at 3-4, 6 and 13).

services fraud, mail fraud and wire fraud, Count 2 – conspiracy to use interstate transportation in aid of a racketeering enterprise, Count 3 – conspiracy to commit unauthorized access to a protected computer, Count 4 - conspiracy to obstruct justice, Counts 5-9 – false statements, and Count 10 – false statements before a grand jury. (Rec. Doc. 8). His co-defendant James Johnson was charged in Counts 1-4, 8 and 10. *Id.* Co-defendant Perry Becnel was charged in Counts 1-4, while co-defendant Josephine Spellman was also charged in Counts 1,4 and 9. *Id.*

Previously, co-defendant James Johnson filed a Motion to Dismiss Count 1(a) which argued that subsection (a), the mail fraud scheme, "fails to allege that the defendants had the specific intent to obtain cash, premium payments or insurance powers of attorney by fraud," and therefore should be dismissed for this omission. (Rec. Doc 116-1 at 2.) The motion was denied by Judge Berrigan on December 10, 2015. (Rec. Doc. 130). An order was entered January 5, 2016 by the Chief Judge, re-allotting the matter from Section C to Section B for a temporary, but indefinite, basis. (Rec. Doc. 131). Defendant filed his current motions on January 24, 2016 and February 12, 2016, respectively. (Rec. Doc. 143 and 154).

## II.   LAW AND ANALYSIS

### A. Standard on Motion to Dismiss Count of Indictment

A defendant may move to dismiss an indictment or a count of the indictment for failure to charge an offense under Federal Rule of Criminal Procedure 12(b)(3)(B). Under Rule 7(c) an indictment must contain a "plain, concise and definite written statement of the essential facts constituting the offense charged." Under the Sixth Amendment, there are essentially the same requirements, since an indictment must "(1) enumerate each prima facie element of the charged offense; (2) fairly inform the defendant of the charges filed against him; and (3) provide the defendant with a double jeopardy defense against future prosecutions." *United States v. Gaytan*, 74 F.3d 545, 551 (5th Cir. 1996). There is no "ritual of words" that are required for an indictment to be deemed sufficient. *United States v. Wilson*, 884 F.2d 174, 179 (5th Cir. 1989). As long as the statute contains the essential elements of the offense, utilizing the statutory language in the indictment is a generally accepted practice. *United States v. Gordon*, 780 F.2d 1165, 1169 (5th Cir. 1986). Since the purpose of the indictment is to fairly inform the defendant of the charge(s) against him, the government is not required to prove the charges in the indictment. *United States v. Cavalier*, 17 F.3d 90, 92 (5th Cir. 1994). Rather, the government's duty in the indictment is to clearly enumerate

7

the elements of the offense so as to fairly notify the defendant as to the charges and ensure against the risk of future prosecutions for the same offenses. *Id.*

On a motion to dismiss an indictment, the "allegations of the indictment must be taken as true." *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n.16, 72 S.Ct. 329, 332 n.16, 96 L.Ed. 367 (1952); *see United States v. Mann*, 517 F.2d 259, 266 (5th Cir. 1975). The Court must examine the relevant statutes and determine if the facts and charges alleged in the Indictment reflect a proper interpretation of criminal activity under those statutes.

### B. Motion to Dismiss Count 1(a): Mail Fraud (Rec. Doc. 143)

A conviction under 18 U.S.C. § 1341 requires the government to prove: "(1) a scheme to defraud, (2) which involve[d] the use of the mails, (3) for the purpose of executing the scheme." *United States v. Powers*, 168 F.3d 741, 747 (5th Cir. 1999) (citing *United States v. Gray*, 96 F.3d 769, 773 (5th Cir. 1996)). The requirements to sufficiently charge mail fraud in an indictment are very similar and must include:  "(1) the defendant devised or intended to devise a scheme to defraud, (2) the mails were used for the purpose of executing, or attempting to execute, the scheme, and (3) the falsehoods employed in the scheme were material." *United States v. Ratcliff*, 488 F.3d 639, 644 (5th Cir. 2007) (citing *United States v. Caldwell*, 302 F.3d 399, 409 (5th Cir. 2002)). When an indictment

8

charges defendants with conspiracy to commit an offense, the indictment need not detail all the elements essential for the offense comprising the object of the conspiracy. *United States v. Lawrence*, 727 F.3d 386, 397 (5th Cir. 2013).

Defendant's motion argues that the mailings referred to in the indictment as the basis for the mail fraud count were "not sufficiently closely related" to the alleged scheme to bring Defendant's conduct within the confines of 18 U.S.C. § 1341. (Rec. Doc. 143-1 at 2). Specifically, Defendant argues that the copies of the power of attorney were mailed to the insurance companies three weeks to a month after the inmates' release. *Id.* Since the indictment alleges that the object of the conspiracy was to obtain the release of inmates, Defendant contends that the scheme or artifice was completed prior to the mailings. *Id.* at 3.

The government's opposition to the motion argues that the mailings in question were "an integral part of the long-running mail fraud conspiracy," and Count 1(a) of the indictment sufficiently alleges mail fraud. (Rec. Doc. 161 at 1, 3). The government highlights three mailings detailed in the indictment that were essential to the mail fraud scheme:

(1) The bail office on South Broad Street in New Orleans received powers of attorney and other documents by interstate commercial carriers from Florida insurance companies for

Defendant, co-defendant Perry Becnel and others to act unlawfully as bail bondsman;

(2) The defendants were required to send back to the Florida insurance companies copies of the powers of attorney, checks signed in the name of James Johnson, premium reports, bond discharge reports, and forfeiture reports, by commercial carrier; and

(3) The execution and filing of every commercial bail bond caused the sheriff to send notices of court appearances to the bonding office and notices of forfeiture to the Florida insurance company by U.S. mail.

(Rec. Doc. 161 at 3).

Defendant relies heavily on the Fifth Circuit case *United States v. Vontsteen*, 872 F.2d 626 (5th Cir. 1989) where the Court reversed a mail fraud conviction since the fraud was completed prior to and independent of relevant mailings alleged to have been in furtherance of the scheme. Under circuit case law, the government has the burden to prove the mailings were "'for the purpose' of executing a fraudulent scheme." *Id.* at 628, *quoting United States v. McClelland*, 868 F.2d 704, 707 (5th Cir. 1989). In *Vontsteen*, the defendant was employed by a company that bought and sold oilfield pipes. 872 F.2d at 627. The defendant caused the company to purchase pipes on credit and resell them, pocketing the

10

profit but refusing to pay the suppliers. *Id.* at 628. The mailings used to establish the jurisdictional basis for the mail fraud charge were invoices sent to the company by the defrauded suppliers, and were never paid. *Id.* The Fifth Circuit held that in this fact pattern, the fraudulent scheme was completed prior to the mailings since the extensions of credit integral to the scheme were "finalized independent of, and prior to the mailing of the invoices." *Id.* at 629. However, dicta from the opinion indicates that if the record had included evidence that the invoices were legally operative documents, which finalized the extension of credit upon which the scheme depended or were paid in order for the company to maintain its good credit and procure more supplies, a "different result might be required." *Id.*

Based on this decision, Defendant argues that the mailings of the powers of attorney to the insurance company weeks after the inmates were released was to hold the agents of the bail bond office financially accountable, and were unrelated to the actual release of the inmates, which the government contends was the object of the scheme or artifice. (Rec. Doc. 143-1 at 5). However the history of the Supreme Court and Fifth Circuit case law belies such a simplistic analysis.

The Supreme Court held in *Parr v. United States* that a fraudulent scheme reached its fruition prior to the mailings used

11

for the basis of the mail fraud charge. 363 U.S. 370, 392-93 (1960). In *Parr*, school district employees made unauthorized gasoline and oil purchases on credit cards. *Id.* at 382. The oil companies mailed invoices for these purchases to the school district, which the school district paid by mailing checks to the oil companies. *Id.* The Supreme Court held that the fraudulent scheme was already completed by the time these mailings occurred, and therefore the mailing requirement was not met. *Id.* at 392-93.

After *Parr*, the Supreme Court addressed the issue again several times: *United States v. Maze*, 414 U.S. 395 (1974) (finding no jurisdiction when defendant fraudulently used credit card for food and lodging); *United States v. Sampson*, 371 U.S. 75 (1962)(mailing requirement satisfied when defendants used letter to mislead fraud victims into believing that their applications for loans had been accepted); *Schmuck v. United States*, 489 U.S. 705 (1989) (mailing requirement satisfied when defendant car dealer used mails to complete the sale of vehicles by transferring title after turning back odometers). The Supreme Court has held the ultimate analysis in 18 U.S.C. § 1341 cases revolves around whether the mailings were "little more than post-fraud accounting among the potential victims of the . . . scheme" or were "part of the execution of the scheme to defraud as conceived by the perpetrator at the time, regardless of whether the mailings later,

12

through hindsight, may prove to have been counterproductive and return to haunt the perpetrator of the fraud." *Schmuck*, 489 U.S. at 714-5.

The Fifth Circuit has subsequently applied the analysis in numerous cases and stated a jurisdictional test for the circuit. In *United States v. Kent*, the Fifth Circuit held that mailings could satisfy the requirements of the mail fraud statute if:

> [T]he alleged scheme's completion could be found to have been dependent in some way upon the information and documents passed through the mails. . . . and if the use of the mails was 'an integral part of the scheme to defraud.' . . . This test of dependence does not demand that the use of the mails rather than of a private messenger or other means was itself essential to the fraudulent scheme or that 'the success of the scheme actually depended on the mailings in a "but for" sense.' It instead requires that the thing mailed was an integral part of execution of the scheme so that the use of the mails was in this way 'incident to an essential part of the scheme.'

608 F.2d 542, 546 (5th Cir. 1979) (internal citations omitted).

In its most recent decision, the Fifth Circuit held in *United States v. Traxler*, that 18 U.S.C. § 1341 only requires that "the mails are merely 'incident to an essential part of the scheme,'" "or merely a 'step in [the] plot.'" 764 F.3d 486, 488 (5th Cir. 2014) (quoting *Schmuck* 489 U.S. at 710-11). Further, the defendant does not need to personally effect the mailing since "it is sufficient that he 'cause' the mailing or 'act with knowledge that the use of the mails will follow in the ordinary course of

business, or where such use can reasonably be foreseen, even though not actually intended.'" *Traxler*, 764 F.3d at 488 (quoting *Pereira v. United States*, 347 U.S. 1, 8-9 (1954)).

Additionally, under Fifth Circuit precedent, there is a difference between cases involving a "one-shot" operation and those that involve an "ongoing venture." *Traxler*, 764 F.3d at 489. "The sequence of mailings in a mail fraud scheme is not controlling, particularly where the indictment alleges an ongoing scheme." *Id.* at 488. In *United States v. Mills*, the Fifth Circuit held that the mailing requirement was met when the defendant's scheme to embezzle funds from his employer "involved numerous checks . . . and extended over at least thirteen months." 199 F.3d 184, 189-90 (5th Cir. 1999). The mail was an integral part of the scheme because it "depended upon continued harmonious relations among [the defendant's] personal banks, [other financial institutions], and his employer. Otherwise, future fraudulent checks issued pursuant to the scheme would be dishonored and not credited." *Id.* at 190.

The Fifth Circuit in *Traxler*, reached a similar result in finding that without the continued mailings of credit card bills and payments, the defendant would not have been able to defraud her employer of all her unauthorized purchases. 764 F.3d at 490. The Fifth Circuit explained the difference between *Mills* and

14

*Traxler*, and the defendants in *Maze, Parr*, and *Vontsteen*, is that in *Mills* and *Traxler*, it was "material . . . that their employers continue to make payments in order for their ongoing schemes to continue." *Id.*

In the present case, it was crucial to defendants' alleged scheme that the powers of attorneys continued to be received from the insurance companies and the copies of the executed powers of attorney were returned to the insurance companies in order to continue to sign for and issue commercial bail bonds. These transactions were done through commercial carriers and/or the United States Postal Service. The alleged scheme, from conception, had to include these mailings, because without them, the defendants would not have had the ability to negotiate commercial bail bonds. Further, the alleged fraudulent scheme was not a "one-off," but rather extended for several years as an "ongoing venture." As in *Traxler*, the defendants' scheme relied "upon continued harmonious relations" between the insurance companies and the licensed bail bondsman Defendant allegedly signed for.

At this stage in the proceeding, as stated above, the government is not required to prove every element of its case, nor is it required to prove every element of a substantive offense when the defendant is charged with conspiracy. It is enough for the indictment to sufficiently allege the charges and enumerate

15

the basis for the charges. Under 18 U.S.C. § 1341, the indictment includes enough alleged acts, specifically the sufficiency of the relevant mailings, to satisfy the requirements of a conspiracy to commit mail fraud charge.

## C. Motion to Dismiss Count 1(b): Honest Services Fraud (Rec. Doc. 154)

In his second Motion to Dismiss, Defendant moves to have Count 1(b) dismissed because, as he argues, the indictment fails to allege that he used interstate commercial carriers or the U.S. Postal Service in furtherance of a scheme or artifice to commit honest services fraud. (Rec. Doc. 154). Defendant's second motion re-urges the same argument as the first in regards to the use of the mailing of the powers of attorney to the insurance company not being a sufficient basis for the mail fraud charge since the alleged scheme or artifice was completed prior to the mailings. *Id.* at 3. For the reasons stated above, Defendant's argument regarding the insufficiency of the mailings fails.

However, Defendant also argues that the actions described in Count 1(b) of the indictment do not violate independent state laws and therefore do not constitute honest services fraud. The government argues Count 1(b) of the indictment charges Defendant with a conspiracy to commit a "classic bribery scheme," where "the defendants made cash payment to three public employees to influence

16

them in official acts relating to their responsibilities." (Rec. Doc. 161 at 7). Citing *Skilling v. United States*, 561 U.S. 358 (2010) and *United States v. Nagin*, 810 F.3d 348 (5th Cir. 2016), the government argues that the Supreme Court has held that bribery and kickback schemes fall squarely within the meaning of "honest services" fraud under 18 U.S.C. § 1346. (Rec. Doc. 161 at 7).

The Supreme Court has held that "[i]n proscribing fraudulent deprivations of 'the intangible right of honest services,' § 1346, Congress intended at least to reach schemes to defraud involving bribes and kickbacks." *Skilling v. United States*, 561 U.S. 358, 368 (2010). The Supreme Court's decision in *McNally v. United States* found that there was no mail fraud or violation of honest services when a state officer who, in selecting the state's insurance agent, arranged to procure a share of the agent's commissions via kickbacks paid to companies the official partially controlled, because the government did not allege that the state would have paid a lower premium or secured better insurance. 483 U.S. 350 (1987). Following that decision, Congress enacted a new statute "specifically to cover one of the 'intangible rights' that lower courts had protected . . . prior to *McNally*: 'the intangible right of honest services.'" *Cleveland v. United States*, 531 U.S. 12 (2000). Looking at pre-*McNally* case law, the Supreme Court found that "the 'vast majority' of the honest-services cases involved

17

offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes." *Skilling v. United States*, 561 U.S. at 407 (citing *United States v. Runnels*, 833 F.2d 1183, 1187 (6th Cir. 1987)). Thus, "to convict a person of honest-services fraud, the prosecution must prove a bribery or kickback scheme as part of the crime." *Nagin*, 810 F.3d at 344. However, the *Skilling* decision did not state whether the conduct prosecuted under § 1346 had to be a violation of state law as well.

Following the *Skilling* decision, the Fifth Circuit has had several opportunities to address whether § 1346 only criminalizes bribery and kickback schemes under federal law or whether the conduct in question had to be a violation of state law as well. In *United States v. Teel*, the Fifth Circuit held that the *Skilling* decision "recogniz[ed] that § 1346 prosecutions ***may*** involve misconduct that is also a violation of state law." 691 F.3d 578, 584 (5th Cir. 2012) (emphasis added). The Fifth Circuit's *Teel* decision alluded to the fact that a § 1346 prosecution could involve conduct that would not be a violation of state law.

The Defendant has erroneously cited to *United States v. Brumley*, 79 F.3d 1430 (5th Cir. 1996) for the proposition that "in order for a state official to have committed honest services fraud, he or she must have violated the state statute that defines the services which were owed to the employer (the State)." (Rec. Doc.

154-1 at 5). However, this case was reversed on re-hearing, with the Fifth Circuit stating that the facts of the case did not require them to decide if the federal statute criminalized conduct that was not a violation of state law. *U.S. v. Brumley,* 116 F.3d 728 (5th Cir. 1997). Further, the Fifth Circuit's recent *Nagin* opinion does not state that an accusation of a violation of state law is required for a conviction under § 1346. *Nagin*, 810 F.3d 348.

Additionally, the Fifth Circuit has held that courts should look to federal bribery statutes "to give substance to the prohibition on honest-services fraud" as directed in *Skilling*. *Nagin*, 810 F.3d at 353. The Fifth Circuit held that there is no requirement in § 1346 prosecutions that the government provide proof that the public official intended to be influenced in his official actions. *Id.* at 6. However, there must be proof that an official had "entered into a *quid pro quo* knowing that the purpose behind the payment that he has . . . agreed to receive[] is to induce or influence him in an official act, even if he has no intention of actually fulfilling his end of the bargain." *Id.* quoting *United States v. Valle*, 538 F.3d 341, 347 (5th Cir. 2008). Further, there does not need to be proof of an express statement of the terms of such a *quid pro quo* between the official and the payor. *Nagin*, 810 F.3d at 355.

The government argues that since the indictment alleges a fraud scheme whereby the defendants induced and influenced public employees in official acts with a *quid pro quo* arrangement, the indictment sufficiently alleges a conspiracy to commit honest services fraud under 18 U.S.C. § 1346. (Rec. Doc. 161 at 8). This Court agrees. There is no requirement that the actions taken by the public officials in exchange for the payments and kickbacks be a violation of state law. It is enough for the indictment to allege that the "public official[s] accept[ed] or offer[ed] to accept . . . anything of . . . value . . . *in return* for being influenced in his performance of an official act." *Nagin,* 810 F.3d at 351. Accordingly,

**IT IS ORDERED** that Defendant Rufus Johnson's Motion to Dismiss Count 1(a) is **DENIED**. Rec. Doc. 143.

**IT IS FURTHER ORDERED** that Defendant Rufus Johnson's Motion to Dismiss Count 1(b) is **DENIED**. Rec. Doc. 154.

New Orleans, Louisiana, this 11th day of March, 2016.

_____
UNITED STATES DISTRICT JUDGE