## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                  CRIMINAL ACTION

VERSUS                                    NO. 14-238

RUFUS JOHNSON, ET AL.                     SECTION "B"(4)

### ORDER AND REASONS

Before the Court are four motions. First, Defendants Rufus and James Johnson filed a "Motion to Dismiss Count 1." Rec. Doc. 199. The Government filed a response. Rec. Doc. 219. Second, Defendant Rufus Johnson filed a "Motion to Dismiss Counts 2 and 3 of the Indictment." Rec. Doc. 233. The Government filed a response (Rec. Doc. 242) and Defendant Rufus Johnson filed a reply memorandum (Rec. Doc. 245). Third, Defendant Rufus Johnson filed a "Motion to Dismiss Counts 1, 2, 3, and 4." Rec. Doc. 257. The Government timely filed a response. Rec. Doc. 261. Finally, Defendant Rufus Johnson also filed a "Motion to Dismiss Counts, 5, 6, and 7 because they are Multiplicitous." Rec. Doc. 198. Again, the Government filed a response. Rec. Doc. 218. Oral arguments on these motions were heard on January 4, 2017 (*see* Rec. Doc. 266) and post-hearing memoranda were filed by Defendant Rufus Johnson (Rec. Doc. 267), Defendant James Johnson (Rec. Doc. 268) and the Government (Rec. Doc. 269).

For the reasons discussed below,

**IT IS ORDERED** that the motion to dismiss Count 1 (Rec. Doc. 199) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 2 and 3 (Rec. Doc. 233) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 1, 2, 3, and 4 (Rec. Doc. 257) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 5, 6, and 7 (Rec. Doc. 198) is **GRANTED IN PART.**

**IT IS FURTHER ORDERED** that the motion to disqualify counsel (Rec. Doc. 200) is **DISMISSED AS MOOT.**

## I.   MOTION TO DISMISS COUNT 1 (REC. DOC. 199)

Count 1 of the indictment alleges that Defendants conspired to commit mail, wire, and honest services fraud in violation of 18 U.S.C. § 1349. Rec. Doc. 8 at 33.

### A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The indictment alleges a complex conspiracy to fraudulently obtain money in exchange for facilitating the release of inmates from Orleans Parish Prison. Rec. Doc. 8 at 20. Specifically, Defendants Rufus Johnson, James Johnson, Perry Becnel, Josephine Spellman, and other co-conspirators are accused of operating a bail bond business in New Orleans that "used various means, permeated by fraud, in order to obtain inmate releases for customers, including executing commercial surety bail bond contracts; illegally requesting for-profit recognizance releases

from public officials; and bribing public employees to release inmates and disclose confidential law enforcement information." *Id.* at 9.

### 1. Bail Bond Scheme

To solicit and negotiate bail bonds in this state, a person must obtain a Louisiana bail producer license, issued by the Louisiana Department of Insurance, and an appointment from an insurance company to sign powers of attorney. *See* LA. REV. STAT. ANN. § 22:1556(A). The indictment alleges that Defendant Rufus Johnson did not have a license or an appointment, as required by Louisiana law. Rec. Doc. 8 at 22. Instead, he purportedly hired employees who did possess the necessary qualifications, or required employees to acquire such qualifications, in order to operate his bail bond business under their licenses and sign their names to documents. *Id.*

The indictment further alleges that Insurance Companies A and B were Florida companies authorized by the Louisiana Department of Insurance to act as commercial sureties in bail bond contracts. Rec. Doc. 8 at 9-11. Both companies used commercial carriers to send and receive powers of attorney with local bail bondsmen. *Id.* The Government also alleges that Defendant James Johnson, who was (1) an attorney, (2) a Louisiana licensed bail bondsman from October 2000 to approximately January 2010, and (3) an appointed bail agent for Insurance Company A from August 1, 2003 to

approximately February 2010, appointed several sub-agents who allowed Defendant Rufus Johnson to use their licenses for the conspiracy. *Id.* at 12, 14-5.

According to the indictment, commercial bail bonds at Criminal District Court were processed through the Magistrate Clerk's Office. Rec. Doc 8 at 7. A bond clerk in that office would prepare a typed bail bond form at the request of a bail bondsman. *Id.* This form included the name of the inmate, his or her criminal charge(s), the bail amount, and the name of the insurance company acting as surety. *Id.* The bail bondsman was required to present an executed power of attorney that authorized him or her to sign bail bonds on the insurance company's behalf. *Id.* Then the bondsman would sign the bail bond form in the presence of the bond clerk, who would also sign the bond to certify that he or she witnessed the bondsman signing and that it was indeed the named bondsman who signed. *Id.* From there, the bondsman would take the bail bond and the insurance power of attorney to the "bond window" at the prison. *Id.* at 8. Prior to being released, the inmate was required to sign the bail bond as the principal obligor of the bond. *Id.* Upon his or her release, the executed bail bond and insurance power of attorney became a part of the defendant's official court record for the criminal case and was entered into the Sheriff's computerized system. *Id.* The bondsman was also required to send

copies of the executed powers of attorney back to the insurance companies through the U.S. mail or common carrier. *Id.* at 22.

Defendant Rufus Johnson is alleged to have operated a bail bond business that used various names, without a proper license, from a building at 538 South Broad Street in New Orleans from "sometime in 2000 and continuing through in or around September 2014." Rec. Doc. 8 at 11. He is accused of having signed bail bonds under his employees' names, licenses, and insurance appointments. *Id.* at 14-16.

### 2. Honest Services Scheme

As part of the conspiracy, Defendant Rufus Johnson also allegedly bribed public officials within the Magistrate Clerk's Office in exchange for (1) "obtaining bail bonds that had been pre-signed and pre-certified by a bond clerk" and (2) "delivery of unexecuted bail bonds, court documents, and information." Rec. Doc. 8 at 17-19. Purportedly, these public officials were also bribed to obtain released on his or her own recognizance ("R.O.R.") bonds, change inmates' bail status to either lower the set bail amount or change to an R.O.R., or to forge and fabricate official documents indicating that a judge had ordered an inmate's R.O.R.[1]

---

[1] R.O.R. releases for municipal and traffic offenses can be ordered by every elected public official in New Orleans, including members of the Orleans Parish Democratic Executive Committee, of which Defendant James Johnson was a member from February 20, 2008 to February 20, 2012. Rec. Doc. 8 at 3-4, 6, 13. For all other offenses, an R.O.R. can only be ordered by a judge or commissioner and requires a signed Order of Release. *Id.*

*Id.* at 20-33. Additionally, Defendants are accused of bribing these public officials in exchange for "obtaining confidential, official-use law enforcement information from limited access computer databases." *Id.* at 21.

### 3. Procedural History

Defendants previously moved to dismiss Count 1. *See* Rec. Docs. 116, 143, 154. In the first motion to dismiss, Defendant James Johnson argued that Count 1(a), the mail fraud scheme, "fails to allege that the defendants had the specific intent to obtain cash, premium payments or insurance powers of attorney by fraud" and therefore should be dismissed. Rec. Doc. 116-1 at 2. The motion was denied by Judge Berrigan on December 10, 2015. Rec. Doc. 130. Thereafter, Defendant Rufus Johnson moved to dismiss Count 1(a) because the mailings referred to in the indictment were "not sufficiently closely related" to the alleged scheme to bring Defendant's conduct within the confines of 18 U.S.C. § 1341. Rec. Doc. 143-1 at 2. He also moved to dismiss Count 1(b), the honest services fraud scheme, because (1) the indictment failed to allege that he used interstate commercial carriers or the U.S. Postal Service in furtherance of the scheme and (2) the actions described in the indictment did not violate independent state laws. Rec. Doc. 154. This Court denied both motions on March 11, 2016. Rec. Doc. 168.

6

## B. THE PARTIES' CONTENTIONS

First, Defendants Rufus and James Johnson argue that Count 1 should be dismissed because it does not allege a scheme to defraud a victim of anything of value, as required by *Cleveland v. United States*, 531 U.S. 12 (2000). Rec. Doc. 199 at 1. As to the bail bond scheme, Defendants contend that "it cannot be said that [] any person or entity was deprived of money or property, as each received precisely what he bargained for:  the inmate was released from prison, and the surety company received its portion of the premium payments." Rec. Doc. 199-1 at 3-4. As to the honest services scheme, Defendants admit that the citizens of New Orleans are identified as the victims and that they were deprived of honest services, but they argue that no misrepresentation was made. *Id.* at 5. "[E]ach of the licensed bondsmen gave permission to the unlicensed bondsman, *e.g.*, Rufus Johnson, to sign the bond . . . [and then] the true signatory, Rufus Johnson, signed the bond before the clerk, and there was no misrepresentation to the court as to who was actually signing the bond." *Id.* Finally, Defendants assert that "it is impossible to tell what mailing, if any, was used to further the [honest services scheme]." *Id.* The Government suggests that these arguments were already made by Defendants and rejected by the Court. Rec. Doc. 219 at 3, 5.

In his post-hearing memorandum, Defendant James Johnson reiterates that the indictment fails to allege a victim of the

conspiracy. Rec. Doc. 268 at 1. According to him, if the victim is supposed to be the insurance companies, then any injury suffered is too "intangible or attenuated for the alleged behavior to reach the threshold of fraud." *Id.* at 7 (citing *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970); *United States v. Takhalov*, 827 F.3d 1307 (11th Cir.), *as revised* (Oct. 3, 2016), *opinion modified on denial of reh'g,* 838 F.3d 1168 (11th Cir. 2016)). In response, the Government maintains that the indictment "alleged that the conspiracy constituted a violation of the public's right of honest services and, further, alleged a harm to non-governmental victims:  the citizenry and the insurance companies who issued the powers of attorney." Rec. Doc. 269 at 9.

Second, and alternatively, Defendants argue that Count 1 should be dismissed because it alleges three conspiracies in a single count. Rec. Doc. 199-1 at 5. According to Defendants, each sub-section of section (B)(1) of Count 1 describes a different scheme. *Id.* at 6-7. The first supposed conspiracy is the bail bond scheme outlined in sub-section B(1)(a), in which Defendants allegedly used mail services to "carry out a scheme to defraud an unnamed victim of unspecified 'cash, premium payments, and insurance powers of attorney.'" *Id.* at 6. However, Defendants argue that this scheme did not involve bribes or public employees and presumably only involved Nicole Carrie, Tynekia Buckley, and Janet Smith (licensed bondsmen operating out of the bail bonding office

where Defendant Rufus Johnson worked). *Id.* at 6-7.[2] The second supposed conspiracy, outlined in sub-section B(1)(b), is the mail fraud that deprived citizens of the honest services of various public employees (including Lear Enclarde, Gilishia Garrison, and Patricia Tate) and involved bribes paid by Defendants Rufus Johnson and Perry Becnel to Tate and Garrison, respectively. *Id.* at 7. The third supposed conspiracy, outlined in sub-section B(1)(c), is the wire fraud that allegedly deprived citizens of the honest services of Garrison and involved bribes paid to Garrison for her unauthorized use of a computer system. *Id.*

Third, and alternatively, Defendants argue that Count 1 should be dismissed because the conspiracy alleges multiple objects, namely mail fraud, honest-services mail fraud, and honest-services wire fraud. *Id.* at 8. According to Defendants, this "violates basic notions of notice and procedural due process because it puts the defendants in a situation where they must defend against all three objects, but the jury may convict them of any single object, or worse, non-unanimously of more than one object." *Id.*

In response to the second and third arguments made by Defendants, the Government maintains that this Court previously recognized that Count 1 involves a "single conspiracy that,

---

[2] Defendants appear to admit that the honest services scheme allegedly involved both mail and wire fraud. *Id.* at 6-7.

although complex, had a single goal—to make money by releasing Orleans Parish inmates" under fraudulent and illegal means. Rec. Doc. 219 at 7 (citing Rec. Doc. 168 at 2). In the Government's words "[t]his is not a case of unrelated schemes with distinct participants, but rather a single-minded operation to illegally exploit the criminal justice system by any and all means available in order to [fraudulently] cash in on jail releases." *Id.* at 8.

Fourth, during oral argument, Defendant James Johnson raised federalism concerns, suggesting that recent Supreme Court cases demonstrate that the Government must prove some sort of "federal nexus" to justify bringing charges like the honest services count charged here. *Id.* at 2 (citing *Skilling v. United States*, 561 U.S. 358 (2010); *McDonnell v. United States*, 136 S. Ct. 2355 (2016)). According to the Government, "the *McDonnell* Court made no broad pronouncement concerning federalism," but instead "provides guidance and clarification as to what constitutes an 'official act.'" *Id.* at 9-10.

### C. LAW AND ANALYSIS

In sum, this Court must address four separate arguments made by Defendants in attempts to dismiss Count 1 of the indictment. First, Defendants Rufus and James Johnson argue that Count 1 does not allege a scheme to defraud a victim of anything of value, as set forth in *Cleveland v. United States*, 531 U.S. 12 (2000). Even though the Government argues that the Court has already heard this

10

argument and decided against Defendants, this Court's earlier Order focused on Defendants' requisite intent, not necessarily whether or not a scheme to defraud must deprive its victim of something of value. *See* Rec. Doc. 130. Second, Defendants argue that Count 1 alleges three conspiracies and that an "indictment is duplicitous when it joins two or more distinct and separate offenses in a single count." Rec. Doc. 199-1 at 5 (citing *United States v. Morrow*, 177 F.3d 272, 296 (5th Cir. 1999)). Third, Defendants rely on *Yates v. United States*, 354 U.S. 298 (1957), *overruled on other grounds by Burks v. United States*, 437 U.S. 1 (1978) for the proposition that Count 1 should be dismissed for alleging multiple objects of the conspiracy. Rec. Doc. 199-1 at 7-8. Finally, Defendant James Johnson raises various federalism concerns. Rec. Doc. 268 at 1-2.

### 1. Does Count 1 allege a scheme to defraud victim(s) of something of value?

In *Cleveland*, the petitioner was charged under the federal mail fraud statute, 18 U.S.C. § 1341, after he made false statements in an application submitted to the Louisiana State Police. 531 U.S. at 15. The Supreme Court held that such licenses did not qualify as "property" under § 1341 in the hands of the official licensor and that "[i]t does not suffice . . . that the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be

11

property in the hands of the victim." *Id.* Thus, because the parish's property rights were not affected, the defendant's acts did not constitute mail fraud. *Id.[3]*

Defendants also rely heavily on *United States v. Ratcliff*, 488 F.3d 639, 643-44 (5th Cir. 2007), in which the defendant

> devised a scheme (1) to conceal campaign finance violations from the Board of Ethics, which would (2) deceive the voting public about the campaign contributions he received, which would (3) secure his reelection to office, which would (4) cause Livingston Parish to pay him the salary and other financial benefits budgeted for the parish president.

*Id.* at 645. The Fifth Circuit ultimately determined that "it cannot be said that the parish would be deprived of this money by means of [the defendant's] misrepresentations, as the financial benefits budgeted for the parish president go to the winning candidate regardless of who that person is." *Id.*

Relying on these cases, Defendants seem to argue that even if misrepresentations were made to the court and/or sheriff, neither the court nor the sheriff was deprived of money or property, so Count 1 must be dismissed. Rec. Doc. 199-1 at 4. However, Defendants overlook *United States v. McMillan*, in which the appellants were convicted of misrepresenting the financial condition of a Louisiana health maintenance organization ("HMO") known as The Oath. 600 F.3d 434, 440-41 (5th Cir. 2010).

---

[3] This case is discussed more fully in conjunction with Defendant Rufus Johnson's motion to dismiss Counts 1, 2, 3, and 4 (Rec. Doc. 257). *See infra* pg. 38.

Specifically, the appellants filed false insurance reports with the state, which allowed the HMO to operate and collect insurance premiums from insured customers. *Id.* at 441-42. On appeal, they argued that the misrepresentation was made to the state, which was not deprived of any money or property (because it did not have a property interest in the license), such that there was a clear *Cleveland* problem. *Id.* at 447. Ultimately, the Fifth Circuit noted that it did "not read *Ratcliff* as requiring that the victim who loses money or property in a mail fraud scheme also be the party that was deceived by the defendant's scheme." *Id.* at 449. It further stated that "[i]t is irrelevant for our purposes whether alleged misrepresentations about The Oath's financial condition were made to the state Department of Insurance or directly to the alleged victims of the scheme. The issue is whether the victim's property rights were *affected* by the misrepresentations." *Id.* (emphasis added). In that case,

> The scheme alleged . . . was for the defendants to obtain money from The Oath and the insureds in the form of management fees and premiums, respectively, which was possible only because of The Oath's continued operation as a result of the fraudulent statements, and then to retain the money rather than pay it out to satisfy claims of the medical providers. We think this satisfies *Cleveland*'s requirement that the object of the fraud be actual money or property in the hands of the victim.

*Id.*

Here, assuming that Defendants accurately construe the indictment and that misrepresentations were made to the court

and/or sheriff, the victims nevertheless likely include (1) customers who paid for Defendants' services thinking that they were obtaining legitimate bail bonds not subject to attack as fraudulent documents and (2) the insurance companies that unknowingly became liable for unknown sums of money as a result of illegally obtained bonds.[4] Thus, the victim's property rights were affected by the misrepresentations that Defendants allegedly made to the court and/or sheriff and this is sufficient under *McMillan*.

In a similar vein, Defendant James Johnson's post-hearing memorandum relies on *United States v. Regent Office Supply Co.*, 421 F.2d 1174 (2d Cir. 1970) and *United States v. Takhalov*, 827 F.3d 1307 (11th Cir.), *as revised* (Oct. 3, 2016), *opinion modified on denial of reh'g,* 838 F.3d 1168 (11th Cir. 2016) to suggest that

---

[4] Indeed, these arguments were made by the Government in response to Defendants' earlier motions. *See* Rec. Doc. 118 at 4-5. Notably, it is widely understood that "[t]he purpose of bail is to secure the presence of the defendant . . . ." *Unite States v. Parr*, 594 F.2d 440, 442 (5th Cir. 1979) (citing *Smith v. United States*, 357 F.2d 486 (5th Cir. 1966)); *see also Reynolds v. United States*, 80 S. Ct. 30, 32 (1959). In Louisiana, "[t]he amount of bail shall be fixed in an amount that will ensure the presence of the defendant, as required, and the safety of any other person and the community, having regard to:" (1) the seriousness of the charged offense; (2) the weight of the evidence; (3) the defendant's criminal record; (4) the defendant's ability to pay; (5) the nature and seriousness of the danger to others that would be posed by the defendant's release; (6) the defendant's voluntary participation in a drug testing program; (7) the defendant's drug use; (8) if the defendant is currently out on bail on a previous felony arrest; (9) other circumstances affecting the probability of the defendant's appearance; and (10) the type and form of bail. La. Code Crim. Proc. Ann. art. 334 (2017). By allegedly depriving a neutral arbiter of the opportunity to consider these factors, Defendants probably secured the release of inmates for a sum substantially less than they would have otherwise been forced to pay. As a result, the probability of these defendants subsequently appearing before the court was likely lower and the risk to which the insurance companies exposed greater.

the alleged actions of Defendants in the instant action do not amount to fraud.

In *Regent Office Supply Company*, salesmen used false representations, including, for example, that they were referred by a friend or another firm or that someone had died and excess stationery needed to be disposed of, to "get by" secretaries on the telephone and "to get to the purchasing agent . . . ." 421 F.2d at 1176-77. When the government indicted the company for fraud, the company stipulated that these false statements were made and agreed to an immediate trial. *Id.* at 1176. During the ensuing one-day trial, the government rested its case on the company's stipulations. *Id.* One of its theories was that the customers were defrauded because they were "entitled to give [their] patronage based on honest information;" however, "no proof of any such situation" was actually presented to the court. *Id.* at 1177. Nonetheless, the trial court found that the defendant's conduct constituted a scheme to defraud. *Id.* The Second Circuit reversed. *Id.* at 1179. It found that "solicitation of a purchase by means of false representations not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain, [does not] constitute a 'scheme to defraud' or 'obtaining money by false pretenses' within the prohibition of 18 U.S.C. § 1341." *Id.* at 1179. In other words, "the falsity of their representations was not shown to be capable of affecting the

15

customer's understanding of the bargain nor of influencing *his assessment of the value of the bargain to him* . . . ." *Id.* at 1182 (emphasis added). The court specifically noted that "this is not to say that we could not, on different facts or more specific proof, arrive at a different conclusion." *Id.* at 1179.

In *Takhalov*, the defendants hired Eastern European women "to pose as tourists, locate visiting businessmen, and lure them into the defendants' bars . . . ." 827 F.3d at 1310. The government also alleged that bar employees engaged in other illicit behavior, including, for example, forging signatures on credit card receipts. *Id.* Defendants requested that the court instruct the jury that "[f]ailure to disclose the financial arrangement between [the women] and the Bar, in and of itself, is not sufficient to convict a defendant of any offense[.]" *Id.* at 1311. The district court refused to give the instruction. *Id.* The Eleventh Circuit reversed and remanded, finding that the proposed instruction was an accurate statement of the law and that the district court's refusal to give it was an abuse of discretion that did not amount to harmless error. *Id.* at 1316, 1319-26. According to the Eleventh Circuit, "to *defraud*, one must intend to use deception to cause some injury . . . ." *Id.* at 1312 (emphasis in original). In other words, "the defendant might lie about the price . . . or he might lie about the characteristics of the good" and that, in each case,

"the defendant has lied about the nature of the bargain and thus . . . has committed wire fraud." *Id.* at 1313-14.

Unlike the misrepresentations in *Regent Office Supply Company* and *Takhalov*, Defendants' alleged misrepresentations in this case amount to fraud. Their false representations (1) fundamentally altered both the insurance companies' and the customers' understanding of the bargain, (2) influenced the insurance companies' and customers' assessment of the value of the bargain to them, and (3) amounted to lies about the "characteristics of the good" at issue (the legitimacy of the bond and the value of any underlying guarantee that the inmates released on these illegitimate bonds would honor their commitment to subsequently appear before the court). The customers in *Regent Office Supply Company* bargained for stationery and were given accurate information regarding the price and quality of the product. Here, the insurance companies agreed to provide insurance on, and Defendants' customers bargained for, legitimate bonds, but instead were bound to, and given, illegitimate ones. If the allegations in the indictment are true, Defendants' conduct amounts to fraud.

The Government does not directly address Defendants' argument that the honest services portion of Count 1 does not allege that misrepresentations were made. *See* Rec. Doc. 199-1 at 5. However, this Court finds this argument to be without merit. On a motion to dismiss an indictment, the "allegations of the indictment must be

17

taken as true." *Boyce Motor Lines v. United States,* 342 U.S. 337, 343 n.16 (1952); *see United States v. Mann*, 517 F.2d 259, 266 (5th Cir. 1975). Here, if all of the allegations in the indictment are accepted as true, Defendants clearly misrepresented themselves in various ways. For example, even if Rufus Johnson, "the true signatory," signed the bond before the clerk, he misrepresented himself as a person <u>with authority</u> to sign the bond; further, when the bond was subsequently used to release an inmate from prison, the "true signatory," Rufus Johnson, was misrepresented on the document as one of the <u>licensed</u> bondsmen working from his bail bonding office.

Further, the Government is correct that this Court previously considered the argument that "it is impossible to tell what mailing, if any, was used to further" the honest services scheme. *See* Rec. Docs. 199-1 at 5, 168 at 16. Because this Court previously found that the cited mailings were sufficient, we will not reconsider this argument.

### 2. Does Count 1 charge Defendants with separate offenses?

According to the Fifth Circuit in *United States v. Elam*, 678 F.2d 1234 (5th Cir. 1982), there are several factors typically considered when determining if a given endeavor comprises one or more conspiracies, including (1) "the existence among the defendants of a common goal," (2) "the inherent nature of the criminal scheme," and (3) "the interrelationships between the

various parts and parties of the scheme." *Id.* at 1246. With regard to the first factor, the Fifth Circuit "ha[s] applied the criteria for a common goal broadly, such that the 'test may have become a matter of semantics.'" *United States v. Beacham*, 774 F.3d 267, 273 (5th Cir. 2014) (quoting *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987)). With regard to the second factor, "[w]here the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture . . . the existence of a single conspiracy will be inferred." *Elam*, 678 F.2d at 1246. As to the third factor, "[w]here members of one enterprise have knowledge, actual or implied, of the existence of members of a related enterprise, and where it is shown that a single 'key man' was involved in and directed illegal activities, while various combinations of other defendants exerted individual efforts toward a common goal, a finding of the existence of a single conspiracy is warranted." *Id.* (citing *United States v. Morado*, 454 F.2d 167 (5th Cir. 1972)). Notably, "a common plan does not become several plans simply because some members are cast in more vital roles than others or because certain members perform only a single, minor function; likewise, a common plan is not transformed into several plans on account of internal personnel changes." *Id.* (citing *United States v. Michel*, 588 F.2d 986 (5th Cir. 1979), *disapproved of by*

*United States v. Black*, 605 F. Supp. 1027 (D.D.C. 1985), *aff'd,* 759 F.2d 71 (D.C. Cir. 1985)).

Here, even though Defendants attempt to separate the various sections of Count 1 into three unique conspiracies, this Court finds that the indictment alleges specific facts that could reasonably lead to the conclusion that there was but one conspiracy alleged in Count 1. Defendants allegedly had a common goal (namely to derive personal gain from running a bail bonding business by fraudulent means); the various activities (including, for example, allegedly requiring employees to acquire bond licenses and bribing public officials) were each related to each other and the common goal; and the indictment convincingly alleges that Defendant Rufus Johnson was a "key man" who directed these various illegal activities.

### 3. Should Count 1 be dismissed for alleging multiple objects of the conspiracy?

The Government notes that, even though the conspiracy involves multiple objectives, it will not be "required to prove that [the defendants] knew of and furthered each one—it [will only be] required to show that [they] knew of the 'essential nature of the conspiracy' and joined it." Rec. Doc. 219 at 9 (citing *United States v. Gutierrez-Acanda*, 628 F. App'x 642, 645 (11th Cir. 2015) (quoting *United States v. Garcia*, 405 F.3d 1260, 1270 (11th Cir. 2005)). Indeed, in the Fifth Circuit, the Government only needs to

prove one object of the conspiracy to convict on a single count. *See United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009) (citing *United States v. Mann*, 493 F.3d 484, 492 (5th Cir. 2007) ("a general guilty verdict on a multiple-object conspiracy may stand even if the evidence is insufficient to sustain a conviction on one of the charged objects")). Thus, it is largely irrelevant that Count 1 "puts the defendants in a situation where they must defend against all three objects, but the jury may convict them of any single object, or worse, non-unanimously of more than one object." Rec. Doc. 199-1 at 8.

### 4. Does the indictment pose federalism concerns?

Defendant James Johnson summarized his federalism argument in the following way:

> [T]he Government failed to include a single substantive federal or state statu[t]e in the Indictment that regulates the bond practices that it complains were the subject of the alleged conspiracies. Although defendants do not deny that there are state statutes that govern licensed bail bondsmen, the administration of bonds in Orleans Parish *is a matter of discrete local governance*. In furtherance of setting up the allegations of Count 1 of the Indictment, the Government outlines the bail bond procedures in Criminal District Court in great detail. Thereafter, the "manner and means" and "overt acts" alleged by the Government detail actions that are largely part and parcel of the bond business. In short, the allegations *beg the question as to the federal nexus that justifies the honest services fraud charged by the Government*. At the January 4, 2017 hearing, undersigned counsel argued that the Supreme Court's recent line of cases, including *Skilling* and *McDonnell*, have significantly heightened the burden that the Government must meet to bring such cases.

Rec. Doc. 268 at 1-2 (emphasis added).

However, we agree with the Government that the Supreme Court's decisions in *Skilling* and *McDonnell* do not raise federalism concerns that would prevent this Court from exercising jurisdiction over this matter.

In *Skilling*, former Enron executive Jeffrey Skilling was convicted of, among other things, conspiracy to commit honest-services wire fraud in violation of 18 U.S.C. §§ 371, 1341, 1346. 561 U.S. at 367. The indictment alleged a "scheme to deceive the investing public . . . about the true performance of Enron's businesses by: (a) manipulating . . . reported financial results; and (b) making public statements . . . about . . . financial performance . . . that were false and misleading." *Id.* at 369. According to the government, Skilling benefitted from this scheme through his "salary, bonuses, grants of stock and stock options, other profits, and prestige." *Id.* After the Fifth Circuit affirmed the convictions, the Supreme Court granted certiorari. *Id.* at 367. Skilling argued that the honest-services statute, § 1346, was unconstitutionally vague and, alternatively, that his conduct did not fall within the statute's compass. *Id.* at 399. The Supreme Court reviewed the historical development of the honest-services doctrine, recognizing that it previously held in *McNally v. United States* that a scheme in which a state officer selected an insurance agent in exchange for kickbacks paid to companies that the official

partially controlled did not amount to mail fraud. *Id.* at 401-02
(citing 483 U.S. 350 (1987)). After *McNally*, however, Congress
enacted § 1346. *Id.* at 402. To determine the breadth of § 1346,
the *Skilling* Court reviewed the pre- and post-*McNally* case law.
*Id.* at 404-09. It determined that "[t]he 'vast majority' of the
honest-services cases involved offenders who, in violation of a
fiduciary duty, participated in bribery or kickback schemes." *Id.*
at 407.

> In view of this history, there is no doubt that Congress
> intended § 1346 to reach *at least* bribes and kickbacks.
> Reading the statute to proscribe a wider range of
> offensive conduct, we acknowledge, would raise the due
> process concerns underlying the vagueness doctrine. To
> preserve the statute without transgressing
> constitutional limitations, we now hold that § 1346
> criminalizes *only* the bribe-and-kickback core of the
> pre-*McNally* case law.

*Id.* at 408-09 (emphasis in original). The Court continued to find
that the Government never alleged that Skilling "solicited or
accepted side payments from a third party in exchange for making
. . . misrepresentations [about Enron's financial situation]." *Id.*
at 413. Consequently, his conduct did not fall within § 1346's
compass, the conspiracy charge was vacated, and the case was
remanded. *Id.* at 415.

Defendant James Johnson does not, and cannot, argue that the
indictment fails to allege a bribery scheme. We fail to see how
the Supreme Court's decision in *Skilling* would otherwise require
us to dismiss Count 1.

Further, the *McDonnell* Court's discussion of federalism concerns consists of a single paragraph:[5]

> The Government's position also raises significant federalism concerns. A State defines itself as a sovereign through "the structure of its government, and the character of those who exercise government authority." *Gregory v. Ashcroft*, 501 U.S. 452, 460 . . . (1991). That includes the prerogative to regulate the permissible scope of interactions between state officials and their constituents. Here, where a more limited interpretation of "official act" is supported by both text and precedent, we decline to "construe the statute in a manner that leaves its outer boundaries ambiguous and involves the Federal Government in setting standards" of "good government for local and state officials." *McNally v. United States*, 483 U.S. 350, 360 . . . (1987) [*superseded by statute as stated in Skilling v. United States*, 561 U.S. 358 (2010)]; see also *United States v. Emmons*, 410 U.S. 396, 410-11 . . . . (1973) (rejecting a "broad concept of extortion" that would lead to "an unprecedented incursion into the criminal jurisdiction of the States").

136 S. Ct. at 2373. Essentially, the Supreme Court declined to adopt the government's definition of "official act," which would have included actions like hosting functions and making introductions, because the definition was too broad and would consequently encroach upon the state's right to regulate the behavior of public officials. We find nothing in the *McDonnell* opinion, or in the above paragraph, and Defendant James Johnson points us to nothing, to suggest that the instant case raises federalism concerns requiring dismissal of Count 1 of the indictment.

---

[5] *McDonnell* is discussed in more detail below. *See infra* pg. 36.

## II.  <u>MOTION TO DISMISS COUNTS 2 AND 3 (REC. DOC. 233)</u>

Count 2 alleges that Defendants Rufus Johnson, James Johnson, and Perry Becnel conspired to use interstate transportation in aid of a racketeering enterprise and Count 3 alleges that these same Defendants conspired to commit unauthorized access to a protected computer, both in violation of 18 U.S.C. § 371. Rec. Doc. 8 at 34, 39.

### A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Count 2 specifically alleges that Defendants Rufus Johnson and Perry Becnel conspired to use a telephone at various times between 2009 and 2010 to call Gilishia Garrison and to facilitate public bribery. Rec. Doc. 8 at 34, 36-38. Count 3 alleges that, between 2009 and 2010, Defendants Rufus Johnson and Perry Becnel conspired to access a protected computer through Gilishia Garrison to obtain cash and other monetary instruments in exchange for manipulating the Orleans Parish Sheriff's computer system to effect the release of criminal defendants by fraudulently changing the defendants' bail status to R.O.R. or parole. *Id.* at 39.

### B. THE PARTIES' CONTENTIONS

In his motion, Defendant Rufus Johnson argues that the indictment ignores "the ancient and accepted practice of allowing a prosecutor to separately charge in different counts of the same indictment a conspiracy as well as substantive violations for the completed acts" and instead charges "an unprecedented conspiracy

(Count 1) to conspire (Counts 2 and 3)." Rec. Doc. 233-1. Consequently, Defendant argues that Counts 2 and 3 fail to state an offense. *Id.* Further, Defendant maintains that Counts 2 and 3 overlap (1) with each other and (2) with Count 1, as evidenced by the fact that the conspiracies were allegedly accomplished in an identical manner. *Id.* (citing Rec. Doc. 8 at 20-23, 34-36, 39-41). According to Defendant, seventeen of the eighty-two overt acts alleged in Count 1 relate to Counts 2 and 3 and "there is not a single overt act in either Counts 2 or 3 which is not repeated in Count 1." *Id.* at 3.[6]

The Government recognizes that Defendant essentially asserts a multiplicity argument. Rec. Doc. 242 at 1. It responds that the conspiracy charges in Counts 2 and 3 require proof of a fact which the conspiracy charge in Count 1 does not, such that the charges are not multiplicitous and are therefore without defect. *Id.* at 4.

Defendant replies that his motion asserts not only a claim under the Fifth Amendment's Double Jeopardy clause, but also under its Due Process Clause, and that Counts 2 and 3 are not only multiplicitous by virtue of Count 1, but also with each other. Rec. Doc. 245 at 1-2.

---

[6] In support, Defendant compared Count 1 overt act 49 with Count 2 overt acts 1-4 and Count 3 overt acts 1-5; Count 1 overt act 50 with Count 3 overt act 60; Count 1 overt act 56 with Count 3 overt act 7; Count 1 overt acts 57-58 with Count 3 overt acts 8-9; Count 1 overt acts 60, 62-72 with Count 2 overt acts 5-16 and Count 3 overt acts 10-21.

### C. LAW AND ANALYSIS

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." It protects against (1) a second prosecution for the same offense after acquittal; (2) a second prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *Brown v. Ohio*, 432 U.S. 161, 165 (1977) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). "An indictment is multiplicitous if it charges a single offense in separate counts . . . [and t]here are at least two species of multiplicity challenges . . . ." *United States v. Woerner*, 709 F.3d 527 (5th Cir. 2013) (internal citations omitted). The first type of challenge "arises when a defendant is charged with violating two different statutes, one of which is arguably the lesser included offense of the other." *Id.* This type of challenge is addressed in *Blockburger v. United States*, 284 U.S. 299 (1932) and its progeny. *Id.* The second type of challenge "arises when charges for multiple violations of the same statute are predicated on arguably the same criminal conduct." *Id.*

The Government argues that only the first type of challenge is at issue here (*see* Rec. Doc. 242 at 2), but Defendant maintains that both challenges are being made (Rec. Doc. 245 at 2). According to Defendant, the first type of challenge is made because Counts

2 and 3 are multiplicitous in light of Count 1; the second type of challenge is made because Count 3 is multiplicitous in light of Count 2. *Id.*

**1. Are Counts 2 and 3 multiplicitous in light of Count 1?**

When confronted with the first type of challenge, we must determine if the two statutes at issue criminalize the same conduct; this is done by examining both statutes to see if one requires proof of a fact that the other does not. *Blockburger*, 284 U.S. at 304. Notably, though, the "test focuses on the proof necessary to prove the statutory elements of each offense, rather than on the actual evidence to be presented at trial." *Illinois v. Vitale*, 447 U.S. 410, 416 (1980); *see also United States v. Soape*, 169 F.3d 257, 266 (5th Cir. 1999) ("The focus in determining the issue of multiplicity is on the statutory elements of the offenses, not on their application to the facts of the specific case before the court") (citing *United States v. Flores-Peraza*, 58 F.3d 164, 167 (5th Cir. 1995) (citing *United States v. Singleton*, 16 F.3d 1419, 1422 (5th Cir. 1994))). We must also determine whether or not the legislative branch intended to punish the defendant cumulatively under both statutes. *See, e.g. Albernaz v. United States*, 450 U.S. 333, 344 (1981) (noting that in *Whalen v. United States*, 445 U.S. 684, 689 (1980), "[i]n determining the permissibility of the imposition of cumulative punishments for the crime of rape and the crime of unintentional killing in the course

of rape, the Court recognized that the 'dispositive question' was whether Congress intended to authorize separate punishments for the two crimes"). "Where Congress intended . . . to impose multiple punishments, imposition of such sentence does not violate the Constitution." *Id.*[7]

Count 1 charges a violation of § 1349, which provides that "[a]ny person who . . . conspires to commit any offense under this

---

[7] Defendant argues that "[i]n a conspiracy case, the central issue for double jeopardy purposes is whether there was one agreement and one conspiracy or more than one agreement and more than one conspiracy." *United States v. El-Mezain*, 664 F.3d 467, 546 (5th Cir. 2011), *as revised* (Dec. 27, 2011). He further suggests that

> [t]o determine whether the alleged conspirators entered into more than one agreement, we evaluate five factors: 1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offense charged that indicate the nature and scope of the activity that the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place.

*United States v. Delgado*, 256 F.3d 264, 272 (5th Cir. 2001) (citing *United States v. Deshaw*, 974 F.2d 667, 673-74 (5th Cir. 1992) (citing *United States v. Marable*, 578 F.2d 151, 154 (5th Cir. 1978), *overruled by United States v. Rodriguez*, 612 F.2d 906, 919 (5th Cir. 1980), *as stated in United States v. Fisher*, 106 F.3d 622, 633 n.11 (11th Cir. 1997); *but see Delgado*, 256 F.3d at 272 n.5 (stating that "[a]lthough a panel of this Court questioned the vitality of the evidence-based standard for measuring double jeopardy claims . . . the five-factor test for determining whether separate conspiracies were involved remains a viable part of the analysis with respect to double jeopardy claims involving conspiracies") (internal citations omitted))). The Government responds that this type of analysis, "assessing 'whether the offenses are the same,'" is used when a defendant is charged in multiple instruments with conspiracy. Rec. Doc. 242 at 5. The Government notes that both *El-Mezain* and *Delgado* "concerned defendants who, having been convicted previously of a conspiracy offense, sought to dismiss portions of a subsequent indictment because they claimed they had already been convicted of that same offense." *Id.* at 5-6; *see United States v. Jones*, 733 F.3d 574, 579-84 (5th Cir. 2013) (analyzing whether allegations against the defendant in one indictment were sufficiently similar to his prior conviction using the five-factor test); 584-85 (assessing, under *Blockburger*, defendant's multiplicity contention). Rec. Doc. 242 at 6. The parties appear to agree in their post-hearing memoranda that the *Marable* five-factor test should only be used to determine if Counts 2 and 3 are multiplicitous in light of each other, so it will not be discussed in our analysis of Defendant's argument that Counts 2 and 3 are multiplicitous in light of Count 1. *See* Rec. Docs. 267 at 1-2; 269 at 2-4.

chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the . . . conspiracy." Thus, here, it requires proof that (1) Defendant and at least one other person made an agreement to commit honest services, mail, and wire fraud; (2) Defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and (3) during the existence of the conspiracy, one conspirator knowingly committed at least one overt act described in the indictment to accomplish some object or purpose of the conspiracy. *See, e.g. United States v. Sanchez*, 502 F. App'x 375, 383 (5th Cir. 2012).

Counts 2 and 3 charge a violation of § 371, which makes it a crime "[i]f two or more persons conspire . . . to commit any offense against the United States . . . or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy . . . ." Thus, Count 2 would require proof that (1) Defendant and at least one other person made an agreement to commit the crime of using interstate transportation in aid of a racketeering enterprise, as charged in the indictment; (2) Defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further the unlawful purpose; and (3) one of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment in order to

accomplish some object or purpose of the conspiracy. *See* Fifth Circuit Pattern Jury Instruction 2.15A. Count 3 would require the same proof, except that the Government would have to show that there was an agreement to commit unauthorized access to a protected computer. *See id.*

The Government argues that the elements in the conspiracy charges are different in several ways. First, the conspiracy charges in Counts 2 and 3 under § 371 require proof of an overt act, while the conspiracy charge in Count 1 under § 1349 does not. Rec. Doc. 242 at 4 (citing *United States v. Jones*, 733 F.3d 574, 584 (5th Cir. 2013); *United States v. Nowlin*, 640 F. App'x 337, 346 (5th Cir. 2016). Even though the indictment alleged overt acts in connection with the charge under § 1349, it was not required to do so and those overt acts are not elements of the crime. *Id.* (citing *United States v. Covos*, 872 F.2d 805, 810 (8th Cir. 1989) (quoting *United States v. Brown*, 604 F.2d 557, 560 (8th Cir. 1979))); *United States v. Thornburgh*, 645 F.3d 1197, 1204 (10th Cir. 2011). Second, § 1349 "requires proof that the conspirators agreed to violate a statute in Chapter 63 of Title 18," while § 371 requires no such proof. *Id.* (citing *United States v. Ngari*, 559 F. App'x 259, 269-70 (5th Cir. 2014)). Third, and perhaps most persuasively, Counts 2 and 3 require proof that the conspirators agreed to violate 18 U.S.C. §§ 1952 and 1030(a)(4), respectively, while Count 1 does not. *Id.* (citing *United States v. Gonzalez*, 834

F.3d 1206, 1220 (11th Cir. 2016)). Plus, we agree with the Government that, in the last three years, the Fifth Circuit has expressly held that an indictment charging a defendant with a conspiracy in violation of § 1349 and a conspiracy in violation of § 371 is not necessarily defective and does not necessarily raise double jeopardy concerns. Rec. Doc. 242 at 3 (citing *United States v. Khan*, 638 F. App'x 380, 381 (5th Cir. 2016); *Nowlin*, 640 F. App'x at 345-46; *Ngari*, 559 F. App'x at 269-70; *United States v. Njoku*, 737 F.3d 55, 67 (5th Cir. 2013); *Jones*, 733 F.3d at 584).

Because the elements in Counts 1, 2, and 3 are different and must be proven by different evidence (namely regarding honest services, mail, and wire fraud in Count 1, an agreement to use interstate transportation in aid of a racketeering enterprise in Count 2, and an agreement to commit unauthorized access to a protected computer in Count 3), and, given this Fifth Circuit precedent, we find that Counts 2 and 3 are not multiplicitous in light of Count 1.

### 2. Are Counts 2 and 3 multiplicitous in light of each other?

Defendant also argues that Counts 2 and 3 are multiplicitous. Rec. Doc. 245 at 2.[8] Specifically, he contends that, while Count 2 alleged the improper use of a telephone and Count 3 alleged the

---

[8] Defendant specifically argues that because Counts 2 and 3 allege a violation of the same statute and "§ 371 cannot be considered a lesser included offense to § 371," the *Blockburger* test is inapplicable and we must employ the five-factor test announced in *Marable*, 578 F.2d 151. Again, the parties seem to agree that this is the appropriate test. *See* Rec. Docs. 267 at 2; 269 at 2-4.

improper use of a protected computer, the uses "were all a part of the same conspiracy." Rec. Doc. 245 at 3. He further suggests that if he were convicted on both Counts 2 and 3, the Court "would be required to vacate one of the convictions," even if Defendant were only sentenced under one of the counts. Rec. Doc. 245 at 5; *see also* Rec. Doc. 267 at 3-5 (citing *Ball v. United States*, 470 U.S. 856 (1985)).

Charging multiple counts of conspiracy in violation of 18 U.S.C. § 371 is not necessarily multiplicitous; instead, we must first determine if more than one agreement existed. *See, e.g. United States v. Smith*, 424 F.3d 992, 1003 (9th Cir. 2005); *United States v. Delgado*, 256 F.3d 264 (5th Cir. 2001). To make this determination, the Fifth Circuit considers five factors: "1) time; 2) persons acting as co-conspirators; 3) the statutory offenses charged in the indictments; 4) the overt acts charged by the government or any other description of the offense charged that indicates the nature and scope of the activity that the government sought to punish in each case; and 5) places where the events alleged as part of the conspiracy took place. *Delgado*, 256 F.3d at 272 (citing *United States v. Deshaw*, 974 F.2d 667, 673-74 (5th Cir. 1992) (citing *United States v. Marable*, 578 F.2d 151, 154 (5th Cir. 1978))).[9]

---

[9] *See supra* n. 7 for full *Marable* citation.

The Government recognizes that Counts 2 and 3 involve the same time frame, the same co-conspirators, and presumably the same place (factors 1, 2, and 5), but nevertheless argues that "the remaining factors strongly establish the existence of multiple conspiracies." Rec. Doc. 269 at 3. As we have already discussed, Count 2 alleges a conspiracy to use interstate transportation in aid of a racketeering enterprise (18 U.S.C. § 1952), while Count 3 alleges a conspiracy to access a protected computer without authorization (18 U.S.C. § 1030). Thus, even though Counts 2 and 3 both allege violations of § 371, they each allege a violation of a different statute. The Government also argues that Count 3 alleges overt acts not alleged in Count 2. Rec. Doc. 269 at 3. Consequently, we agree with the Government that the indictment did not allege a single offense in more than one count; in other words, Count 3 is not multiplicitous in light of Count 2.

Further, Defendant's reliance on *Ball v. United States* is misplaced. In that case, the defendant was convicted of violating (1) a statute that prohibited a convicted felon from receiving a firearm and (2) a separate statute that prohibited a convicted felon from possessing a firearm. 470 U.S. 856, 857 (1985). Both charges related to the same handgun. *Id.* The Supreme Court held that it was proper to try the defendant on both counts, but that he could only be convicted and sentenced under one. *Id.* at 859, 862-64. According to the Supreme Court, "proof of illegal receipt

of a firearm *necessarily* includes proof of illegal possession of that weapon." *Id.* at 862 (emphasis in original).[10]

Here, again, proof of any one of these charges does *not necessarily* include proof of another. Proof that Defendants conspired to use a telephone to facilitate public bribery does not *necessarily* include proof that Defendants conspired to access a protected computer. Accordingly, Counts 2 and 3 are not multiplicitous.

Nonetheless, even if we found Counts 2 and 3 multiplicitous, Defendant is mistaken that *Ball* would prevent us from allowing the counts to go to the jury. Rec. Doc. 267 at 4. While Defendant is correct that, if Counts 2 and 3 are multiplicitous, Defendant could not be convicted and sentenced to both counts, he incorrectly suggests that we would have to dismiss one of the counts now. Instead, the Supreme Court in *Ball* explicitly stated that

> while the Government may seek a multiple-count indictment against a felon for violations of §§ 922(h) and 1202(a) involving the same weapon where a single act establishes the receipt and possession, the accused may not suffer two convictions or sentences on that indictment. If, upon the trial, the district judge is satisfied that there is sufficient proof to go to the jury on both counts, he should instruct the jury as to the elements of each offense. Should the jury return guilty verdicts for each count, however, the district judge should enter a judgment on only one of the statutory offenses.

---

[10] Stated other ways, "Congress seems clearly to have recognized that a felon who receives a firearm must also possess it, and thus had no intention of subjecting that person to two convictions for the same criminal act" (470 U.S. at 862) and "[t]he independent but overlapping statutes simply are not 'directed to separate evils' under the circumstances" (*id.* at 864).

*Ball*, 470 U.S. at 865 (emphasis added).

Alternatively, Defendant argues that Counts 2 and 3 should be dismissed under the recently-decided Supreme Court case of *McDonnell*, 136 S. Ct. 2355, because "[t]he ministerial acts of the clerk employees complained of herein hardly reach the status of 'official acts,' and the so-called 'protected computer' that affected interstate commerce makes my grandchildren's computers all 'protected computers.'" Rec. Doc. 233-1 at 11.

In *McDonnell*, the petitioner was a former governor charged with, among other things, conspiracy to commit honest services fraud and three counts of honest services fraud in violation of §§ 1343, 1349. 136 S. Ct. at 2365. The theory underlying these charges was that the petitioner accepted bribes. *Id.* Consequently, "[t]he parties agreed that they would define honest services fraud with reference to the federal bribery statute, 18 U.S.C. § 201," which makes it a crime for a public official to seek or receive anything of value in exchange for being "influenced in the performance of any *official act*." *Id.* (citing § 201(b)(2)) (emphasis added). The "official acts" that the government alleged the petitioner performed included arranging meetings, talking to other officials, and organizing events. *Id.* at 2365-66. The Supreme Court concluded that these were insufficient and that an "official act" is a decision or action on a matter that involves a formal exercise of

governmental power and that is pending or may be legally brought before a public official. *Id.* at 2371-72.

The instant case is distinguishable from *McDonnell* because (1) unless there was some agreement between the parties of which the Court is unaware, we have no reason to look to the federal bribery statute, § 201, or its "official act" language; and (2) unlike arranging meetings, organizing an event, or talking to other public officials, the use of government phones and computers to change an inmate's bail status is certainly an "official act" and significant in the context of the conspiracy.[11] However, our findings at this stage would not preclude reconsideration upon a trial request for a judgment or conclusion of law at trial.

III. <u>**MOTION TO DISMISS COUNTS 1, 2, 3, AND 4 (REC. DOC. 257)**</u>

**A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Counts 1, 2, and 3 were previously discussed. Count 4, however, alleges that Defendants Rufus Johnson, James Johnson, Perry Becnel, and Josephine Spellman conspired to obstruct justice in violation of 18 U.S.C. § 1512(b)(3), all in violation of 18 U.S.C. § 1512(k). Rec. Doc. 8 at 44.

**B. THE PARTIES' CONTENTIONS**

In his motion and supporting memorandum, Defendant Rufus Johnson argues that the mail fraud statute does not reach false

---

[11] If Defendant is making a separate Due Process argument that we have not yet discussed, it is not clear to the Court.

statements made in an application for a state license, because the Supreme Court unanimously concluded that permits and licenses do not qualify as "property" under 18 U.S.C. § 1341. Rec. Doc. 257 (citing *Cleveland v. United States*, 531 U.S. 12, 15 (2000)).

In response, the Government argues that the Court has previously considered and rejected this argument, a separate pending motion also relies on *Cleveland* and its progeny, Defendant "mischaracterizes existing precedent and misapprehends the charges in the Indictment," and Defendant fails to extend his *Cleveland* argument to Counts 2, 3, or 4. Rec. Doc. 261 at 1.

### C. LAW AND ANALYSIS

As was previously mentioned, the *Cleveland* Court determined that the petitioner, who made false statements in an application for a license to operate video poker machines and subsequently mailed those applications, could not be prosecuted under § 1341, because the license was not "property" within that statute's compass. 531 U.S. at 15. The Court recognized that Louisiana law allowed businesses to operate video poker machines, but that prospective owners of such machines had to apply for a license from the state to ensure that licensees were of good character and sound fiscal integrity. *Id.* (citing LA. REV. STAT. ANN. §§ 27:301 to 27:324). These licenses were non-transferable and had to be renewed annually. *Id.* (citing § 27:311(G), LA. ADMIN. CODE, tit. 42, § 2405(B)(3) (2000)).

38

The petitioner was an individual who allegedly fraudulently concealed his ownership interest in a limited partnership that applied for, received, and renewed a license to operate such machines, because he had financial problems that could have hindered the partnership's ability to receive a license. *Id.* at 16. Because of these false statements, the petitioner was charged under § 1341. *Id.* Before trial and on appeal, he moved to dismiss the mail fraud counts on the ground that the alleged fraud did not deprive the State of "property." *Id.* at 17.[12] The district court and the Fifth Circuit rejected this argument. *Id.* at 18.[13]

The Supreme Court, however, recognized that its earlier decision in *McNally v. United States*, 483 U.S. 350, 360 (1987), *superseded by statute as stated in Skilling*, 561 U.S. 358, limited the scope of § 1341 to the protection of property rights, rather than "'intangible rights' unrelated to money or property."

---

[12] Petitioner relied on "several Court of Appeals decisions holding that the government does not relinquish 'property' for purposes of § 1341 when it issues a permit or license." *Cleveland*, 531 U.S. at 17-18 (citing *United States v. Shotts*, 145 F.3d 1289, 1296 (11th Cir. 1998) (license to operate bail bonds business); *United States v. Schwartz*, 924 F.2d 410, 418 (2d Cir. 1991) (arms export license); *United States v. Granberry*, 908 F.2d 278, 280 (8th Cir. 1990), *superseded by statute as stated in Schwartz*, 924 F.2d 410 (school bus operator's permit); *Toulabi v. United States*, 875 F.2d 122, 125 (7th Cir. 1989), *superseded by statute as stated in Schwartz*, 924 F.2d 410 (chauffeur's license); *United States v. Dadanian*, 856 F.2d 1391, 1392 (9th Cir. 1988), *superseded by statute as stated in United States v. Little*, 889 F.2d 1367 (5th Cir. 1989) (gambling license); *United States v. Murphy*, 836 F.2d 248, 254 (6th Cir. 1988), *superseded by statute as stated in Schwartz*, 924 F.2d 410 (license to conduct charitable bingo games)).

[13] In addition to the Fifth Circuit, two other Circuits had previously "concluded that the issuing authority has a property interest in unissued licenses under § 1341." *Cleveland*, 531 U.S. at 18 (citing *United States v. Bucuvalas*, 970 F.2d 937, 945 (1st Cir. 1992), *abrogated by Cleveland*, 531 U.S. 12 (entertainment and liquor license); *United States v. Martinez*, 905 F.2d 709, 715 (3d Cir. 1990), *abrogated by Cleveland*, 531 U.S. 12 (medical license)).

*Cleveland*, 531 U.S. at 18-19.[14] In *Carpenter v. United States*, 484 U.S. 19, 25 (1987), the Supreme Court reiterated this holding when it upheld the convictions of defendants who "defrauded the Wall Street Journal of confidential business information," which had "'long been recognized as property.'" *Id.* at 19. In 1988, however, Congress amended the statute to protect "the intangible right of honest services." *Id.* at 19-20 (citing Anti-Drug Abuse Act of 1988, § 7603(a), 18 U.S.C. § 1346). Congress did not, however, amend the statute to protect from "diverse forms of public corruption, including licensing fraud." *Id.* at 20.

Turning to the facts of the case, the Supreme Court found that whatever interest the State of Louisiana had in its video poker licenses, "the State's core concern is *regulatory*." *Cleveland*, 531 U.S. at 20 (emphasis in original). Nonetheless, the State argued that, in addition to its regulatory interests, it also had a property interest in the licenses because (1) "the State receives a substantial sum of money in exchange for each license and continues to receive payments from the licensee as long as the license remains in effect" and (2) "the State has significant control over the issuance, renewal, suspension, and revocation of licenses." *Id.* at 21-22. Recognizing that the State collected a

---

[14] *McNally v. United States* reversed the mail fraud convictions of individuals charged with participating in a scheme that defrauded Kentucky citizens of "the right to have the Commonwealth's affairs conducted honestly." 483 U.S. 350, 352 (1987), *superseded by statute as stated in Skilling*, 561 U.S. 358.

"processing fee" for each new application, a "processing fee" for each renewal application, an "annual fee" from each device owner, a "device operation fee," and a fixed percentage of net revenue from each device, the Supreme Court nevertheless did not see how these fees made the licenses "property" in the State's hands. *Cleveland*, 531 U.S. at 22.

> Licenses pre-issuance do not generate an ongoing stream of revenue. At most, they entitle the State to collect a processing fee from applicants for new licenses. Were . . . this . . . sufficient . . . States [would] have property rights in any license or permit requiring an upfront fee, including driver's licenses, medical licenses, and fishing and hunting licenses.

*Id.* Further, the Court found that the State's right to control the issuance, renewal, and revocation of licenses, "amount to no more and no less than Louisiana's sovereign power to regulate." *Id.* at 23.

The State then compared its interest to a patent holder's interest in an unlicensed patent, but the Court found that the State does not conduct gaming operations itself and it does not "sell" licenses in the "ordinary commercial sense." *Cleveland*, 531 U.S. at 23. Similarly, the Court found that the State could not be compared to a franchisor:

> a franchisor's right to select its franchisees typically derives from its ownership of a trademark, brand name, business strategy, or other product that it may trade or sell in the open market. Louisiana's authority to select video poker licensees . . . rests instead upon the State's sovereign right to exclude applicants deemed unsuitable to run video poker operations.

41

*Id.* at 24. According to the Court, "[a] right to exclude in that governing capacity is not one appropriately labeled 'property.'" *Id.*

Ultimately, the Court determined that "[e]quating issuance of licenses . . . with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities" and, to the extent that the word "property" is ambiguous, the ambiguity should be "resolved in favor of lenity." *Cleveland*, 531 U.S. at 24-25 (internal citations omitted). Thus, "§ 1341 requires the object of the fraud to be 'property' in the victim's hands and . . . a Louisiana video poker license in the State's hands is not 'property' under § 1341." *Id.* at 26-27.

Defendant Rufus Johnson claims that the instant case is indistinguishable from *Cleveland*. First, similar to licenses to operate video poker devices, Defendant maintains that bail bonding licenses have to be obtained from the state, even though the state does not operate a bail bonding business itself; the licenses must be renewed every other year; and applicants have to "meet suitability requirements designed to ensure that license[e]s have good character and fiscal integrity." Rec. Doc. 257-1 at 2. Second, like the petitioner in *Cleveland*, Defendant was accused of fraudulently concealing the true owners of the bail bonding

companies on the license applications mailed to the state. *Id.* at 4. Third, Defendant points to *United States v. Shotts*, 145 F.3d 1289, 1296 (11th Cir. 1998), recognized by the Court in *Cleveland* as one of the preexisting Circuit cases "holding that the government does not relinquish 'property' for purposes of § 1341 when it issues a permit or license." *See Cleveland*, 531 U.S. at 17-18. Significantly, the license at issue in *Shotts* was a bail bond license. *See* 145 F.3d at 1296.

The Government argues, and notes that Defendant himself recognizes, that *Cleveland* is distinguishable because it did not involve "the citizenry's right to the honest services of its public officials." Rec. Doc. 261 at 4. The Supreme Court in *Cleveland* recognized that Congress had previously amended the statute to protect against such fraud. *See Cleveland*, 531 U.S. at 19-20 (citing Anti-Drug Abuse Act of 1988, § 7603(a), 18 U.S.C. § 1346). Further, the Government notes that the indictment does not allege that the State of Louisiana was a victim of the conspiracy, that the licenses were state property, or that the state was deprived of such property. Rec. Doc. 261 at 4-5. "In other words, Johnson overlooks the fact that, unlike in *Cleveland* and *Shotts*, the Government has not alleged that the license at issue[] constituted a property interest belonging to the Government." *Id.* at 5. Instead, the indictment alleges that citizens were victims of honest services fraud, private entities (including insurers and

43

underwriters) were victims who suffered financial exposure, and Defendants' customers were victims who were "defrauded into making premium payments to receive bonds that could have been rescinded . . . ." *Id.* In sum, "[s]ince *Cleveland* applies only to governmental property, it has no relevance to the allegations against Rufus Johnson contained in the Indictment." *Id.* (citing *United States v. Hedaithy*, 392 F.3d 580, 603 (3d Cir. 2004) ("There is no suggestion in *Cleveland*, especially given the Court's holding in *Carpenter*, that the Court's reasoning with respect to the State of Louisiana could be extended to the property interests of private entities").

Instead, the Government argues that this case is analogous to *McMillan*, 600 F.3d 434, previously discussed. *Id.* at 6. Finally, the Government notes that Counts 2 through 4 do not concern either § 1341 or § 1343, conspiracies to commit violations thereof, or fraud at all, such that "no issue exists about whether Johnson's alleged criminal conduct concerned 'money or property.'" *Id.* at 7.

Based on these arguments and the cases discussed herein, the Court is inclined to agree with the Government. If the indictment merely alleged that Defendant Rufus Johnson and his co-conspirators lied to the state in order to obtain bail bonding licenses, this case might be more analogous to *Cleveland*. Instead, the indictment details a complex conspiracy in Count 1 designed to deprive citizens of the honest services of officials in Criminal

District Court, expose insurance companies to financial liability that they did not bargain for, and defraud customers into paying for illegitimate bonds. The Anti—Drug Abuse Act of 1998 specifically criminalizes honest services fraud and the money belonging to the allegedly defrauded insurers and customers certainly constitutes "money or property" within § 1341's compass. Therefore, the Supreme Court's decision in *Cleveland* does not require dismissal of Counts 1 through 4 of the indictment.

IV.  **MOTION TO DISMISS COUNTS 5, 6, AND 7 (REC. DOC. 198)**

Counts 5, 6 and 7 allege that Defendant Rufus Johnson made false statements in violation of 18 U.S.C. § 1001.

**A. FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

Specifically, Counts 5, 6, and 7 of the indictment relate to allegedly false statements made by Rufus Johnson on March 20, 2012 to an agent of the Federal Bureau of Investigation ("FBI"). Rec. Doc. 8 at 45-46. Count 5 alleges that Rufus Johnson stated "that he did not write a bond after the year 1997 and that on only a very few occasions he had filled out the top portion of a bond form for Janet Smith" (*id.* at 45); Count 6 alleges that he stated "that his employment consisted of cleaning and sweeping up around the office located at 538 South Broad Street" (*id.* at 46); and Count 7 alleges that he stated "that Janet Smith was his employer" (*id.*).

45

### B. THE PARTIES' CONTENTIONS

In the motion filed by Defendant Rufus Johnson's previous attorney, it is argued that each of the statements were made during the course of a single interview, the evidence of each statement can be found within Agent Krysti Hawkins's FBI Form-302, and that each statement concerned Rufus Johnson's role at the bail bonding office, such that separating the statements into separate counts is multiplicitous. Rec. Doc. 198-1 at 2. Consequently, Defendant requests that the Court require the prosecution to select the count it wishes to proceed to trial on or to seek a superseding indictment consolidating the various counts. *Id.* at 3.

The Government argues that, even though the three statements are included in the "truthful *document* generated by the FBI after the interview," the Counts correspond to the "several false *oral* statements" made by Rufus Johnson. Rec. Doc. 218 at 1. Further, each statement will require evidence not necessary to prove the other statements. *Id.* at 3.

### C. LAW AND ANALYSIS

Again, "[i]n general, 'multiplicity' is the charging of a single offense under more than one count of an indictment." *Soape*, 169 F.3d at 266. "The chief danger raised by a multiplicitous indictment is the possibility that the defendant will receive more than one sentence for a single offense." *Id.* (citing *United States v. Cluck*, 143 F.3d 174, 179 (5th Cir. 1998) (internal citations

omitted)). "In deciding whether an indictment is multiplicitous, we look to 'whether separate and distinct prohibited acts, made punishable by law, have been committed.' To do so, we must first determine the 'allowable unit of prosecution,' which is the *actus reus* of the defendant." *United States v. Planck*, 493 F.3d 501, 503 (5th Cir. 2007) (internal citations omitted).

Here, under 18 U.S.C. § 1001(a)(2) the actus reus is a false statement, while under § 1001(a)(3) the actus reus is a false writing or document. Rufus Johnson is charged with making three distinct false statements (in violation of § 1001(a)(2)), rather than using a single false writing or document.

Defendant distinguishes two cases that involved false statements on multiple, distinct documents. Rec. Doc. 198-1 at 2 (citing *United States v. Guzman*, 781 F.2d 428, 432 (5th Cir. 1986); *United States v. Aiken*, 575 F. App'x 432, 433 (5th Cir. 2014)). However, those cases are distinguishable simply because they involved multiple documents, rather than multiple statements. Nevertheless, the rationale used in those cases can also be used here. Defendant notes that "[w]here false statements are made in distinct and separate documents requiring different proof as to each statement, the filing of each false document constitutes a crime, and each filing may be alleged in a separate count of the indictment." Rec. Doc. 198-1 at 2 (citing *Guzman*, 781 F.2d at 432). Even though Defendant Rufus Johnson's three statements were

recorded on one document, he arguably made three "distinct and separate [statements] requiring different proof as to each statement, [such that] the [making] of each false [statement] constitutes a crime, and each [statement] may be alleged in a separate count of the indictment."

Defendant also relies on *United States v. Bonds*, 580 F. Supp. 2d 925, 929-30 (N.D. Cal. 2008). That case involved two perjury counts for "two identical false statements." *Id.* Specifically, in count 6, the defendant was asked if Mr. Anderson ever gave him anything that he understood to be human growth hormone, to which he responded "No"; in count 7, the defendant was asked if he was obtaining growth hormone from Mr. Anderson, to which he responded "Not at all." *Id.* at 928.

Here, the three statements made by Rufus Johnson each generally pertained to his employment at the bonding office. However, Count 5 alleges that he said he did not write a bond after 1997, Count 6 alleges that he said he was responsible for cleaning the office, and Count 7 alleges that he said he was employed by Janet Smith. The statement in Count 5 is certainly distinct and this Court agrees with the Government that it will require distinct pieces of evidence, it is significant for a distinct reason, and is therefore punishable separately. However, Counts 6 and 7 relate to statements regarding Defendant Rufus Johnson's role in the bail bonding company. If the Government seeks to prove that Defendant

48

Rufus Johnson was not merely responsible for cleaning the office and was not merely an employee, it will have to prove what his role in the office was. In other words, the evidence needed to prove the falsity of the statements in Counts 6 and 7 will be the same. Counts 6 and 7 are therefore multiplicitous and the Government must dismiss one of them.

### V.   CONCLUSION

For the reasons outlined above,

**IT IS ORDERED** that the motion to dismiss Count 1 (Rec. Doc. 199) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 2 and 3 (Rec. Doc. 233) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 1, 2, 3, and 4 (Rec. Doc. 257) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion to dismiss Counts 5, 6, and 7 (Rec. Doc. 198) is **GRANTED IN PART.** The Government must dismiss either Count 6 or Count 7.

**IT IS FURTHER ORDERED** that the motion to disqualify counsel (Rec. Doc. 200) is **DISMISSED AS MOOT,** pursuant to reasons given orally at the January 4, 2017 hearing. *See* Rec. Doc. 266.

New Orleans, Louisiana, this 8th day of March, 2017.

SENIOR UNITED STATES DISTRICT JUDGE